UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LORETTA LEGGETT (AS ADMINISTRATRIX)
AND INDIVIDUALLY AS PARENT OF
JAVON LEGGETT,

                   Plaintiff                       DECISION AND ORDER

-vs-

                                                05-CV-6702 CJS

CORRECTIONAL MEDICAL SERVICES, INC.,

                   Defendant

_____

APPEARANCES

For Plaintiff:              Van Henri White, Esq.
                           18 Grove Place
                           Rochester, New York 14605

For Defendant:           David E. Rook, Esq.
                           Thuillez Ford Gold Johnson & Butler, LLP
                           20 Corporate Woods Blvd., 6th Floor
                           Albany, New York 12211

INTRODUCTION

Plaintiff alleges that Defendant committed "psychiatric malpractice," resulting in the suicide of her son. Now before the Court is Defendant's motion for summary judgment [#48]. For the reasons that follow, the application is granted.

BACKGROUND

Sixteen-year-old Javon Leggett ("Javon") died in the Monroe County Jail in Rochester, New York, on August 29, 2004. Defendant provided medical and psychological services at the jail at all relevant times. While Plaintiff contends that Javon committed suicide, there is, as discussed below, evidence suggesting that the death may have been

1

accidental. At the time, Javon was in custody pending the disposition of various criminal charges, to which he intended to plead guilty in exchange for a five-year prison term in New York State Prison.[1]  On May 9, 2004, Javon was taken into custody on the charges and placed in the Monroe County Jail.  In connection with his admission to the jail, Javon underwent psychological screening.  In response to questions, Javon denied any history of suicidal thoughts or mental illness.

On July 16, 2004, jail staff discovered Javon underneath his bunk with a bed sheet around his neck.[2]  Defendant's staff treated the incident as an "attempted hanging." Physical examination showed that Javon was awake and alert and had no bruising or marks on his neck.  However, Javon appeared angry.  Defendant's staff placed Javon on suicide watch.  KM ("KM"), a Certified Social Worker, interviewed Javon approximately 30 minutes later, and Javon indicated that although he had been offered a 5-year plea deal, he did not think that he could "do that time."  Javon further stated that he "didn't talk well," and needed help.  Javon asked KM to call his mother, and asked KM to contact his brother to come to the jail and talk with him.  Javon denied having any suicidal thoughts.

On July 19, 2004, JG ("JG"), a social worker, interviewed Javon.  Javon stated that he was classified as emotionally disturbed in 1998, and that he had been receiving mental health treatment on an outpatient basis at Hillside Children's Center since that time.  Javon stated that he felt "hopeless," and "could not do" a five-year sentence.  Javon asked JG

[1] The record is unclear regarding the actual sentence that Javon received. Plaintiff maintains that Javon was sentenced to a five-year sentence in state prison, however, other evidence indicates that Javon received a sentence of "shock probation," consisting of a six-months in jail and five years of probation.

[2] Defendant disputes that the sheet was around Javon's neck, however the Court must view the evidence in the light most favorable to the non-moving party.

2

whether medications might help him. Javon denied having suicidal thoughts. JG recorded that Javon appeared "mildly depressed," and that Javon was having difficulty coping with his possible prison sentence.

On July 20, 2004, JG again interviewed Javon, and reported that Javon was still "mildly depressed." Javon was not future oriented, and felt that things were "hopeless." Javon stated that he had wanted to enter the Army, but would not be able to do so because of the pending felony charge. JG reported that Javon "[d]oes not feel there is much to do in his life anymore," and that he "feels like his life is ruined now because of his charges."

On July 20, 2004, KS ("KS"), a Registered Nurse, interviewed Javon, who was still on suicide watch. Javon indicated that it was difficult for him to "open up" at school, even though he saw a counselor twice per week. Javon and KS discussed the fact that Javon's father had abandoned Javon's family, and had served two separate sentences in New York State Prison. Javon indicated that he received letters from his father, but did not write back. Javon denied having suicidal thoughts. KS noted that although Javon smiled at times, his affect was flat overall. KS had Javon sign forms authorizing the release of his medical records from Marshall High School and Kid's Peace, an institution affiliated with Hillside Children's Center, however, it does not appear that Defendant obtained those records.

On July 21, 2004, JG again spoke with Javon. Javon denied having suicidal thoughts, although he was slow to answer JG's question on that point. JG reported that Javon continued to feel depressed and hopeless. Javon asked if he could remain on the Fourth Floor, where he was on constant watch, and indicated that he "had difficulties" on the other floors where he had been housed in the jail.

On July 22, 2004, JG reported that Javon was in a better mood, and had denied

3

having suicidal thoughts. The same day, Defendant removed Javon from constant observation and, apparently, placed him back in the jail's general population. JG examined Javon again on July 26, 2004, and Javon appeared to be in a good mood, though "a little stressed." Javon indicated that his father had visited him, and had advised him to take the plea deal. Javon stated that he intended to take the five-year plea deal, and that he was hoping to take classes while in jail. Javon again denied having suicidal thoughts. JG's report stated, "Presentation good. Stable." JG offered to "provide support" to Javon after his next court appearance on August 6, 2004, and Javon "accepted" the offer, but it does not appear that JG, or anyone else associated with Defendant, had further contact with Javon.

On August 29, 2004, Javon was found hanging from his cell door with a bed sheet around his neck. Medical staff attempted to revive Javon using CPR, but were unsuccessful, and Javon was taken to a hospital where he was pronounced dead.

Subsequently, Defendant's staff learned that on or about August 26, 2004, an inmate at the jail had told four other inmates, including Javon, that they could be placed in the "forensics" housing unit, which was purportedly more comfortable than the general population housing, if they faked a suicide attempt. On August 27, 2004, three of the inmates engaged in fake suicide attempts by tying sheets around their necks. However, they were not injured. One of those inmates later indicated that Javon had refused to go along with the plan on August 27th, "because he was scared he would die."

On November 16, 2005, Plaintiff commenced the subject action in New York State Supreme Court, Monroe County, against the County of Monroe and the Monroe County Sheriff. The County and the Sheriff removed the action to this Court on the basis of federal

question subject-matter jurisdiction, since Plaintiff was asserting claims under 42 U.S.C. § 1983. Plaintiff later amended her complaint to add a state-law claim for "psychiatric malpractice" against Defendant Correctional Medical Services. Subsequently, Plaintiff discontinued her claims against Monroe County and the Sheriff, leaving only the state-law malpractice claim against Correctional Medical Services.

During discovery, the parties obtained Javon's mental health records from the Rochester City School District's Day Treatment Program, through the Hillside Children's Center ("Hillside Records"). These records indicate that Javon participated in the Day Treatment Program between 1999 and 2003, which was "longer than average," because staff felt that Javon's "impulsive tendencies and poor judgment . . . could easily lead him to acting out behaviors in school without the level of support that Day Treatment provided." The Hillside Records also indicate that Javon "made steady progress behaviorially" during the first three years, but then became "negatively affected by . . . delinquency issues," as a result of which the Hillside staff recommended that he be placed in residential treatment. The records further indicate that Javon had "severe psychosocial stressors," such as living in an a neighborhood rife with violence and drug activity, and that his brother had been institutionalized due to juvenile delinquency.

Defendant also deposed Plaintiff's medical expert, Victor Stiebel, M.D. ("Stiebel"). Stiebel indicated that Defendant had deviated from the standard of care in treating Javon, by, for example, failing to obtain the Hillside Records. However, Stiebel's testimony regarding proximate causation is speculative. For example, Stiebel testified as follows:

> This young man had a number of risk factors, that we've identified, that put him at risk for hurting himself. If the jail had known some of this information up front, if a, you know [sic], board certified forensic psychiatrist or child

5

psychiatrist had seen him, again, while he was there, would they have done anything differently? And I guess my contention is I can't even say.

(Stiebel Aff. at 121). Stiebel further testified:

[I]f a child psychiatrist had seen him, would that have made a difference? Would the kid have still killed himself? Yes, he might have.
\*\*\*

[W]e have, I guess you guys would call it, a litany of omissions that happened, any one of which could have changed the outcome. It might not have, but it could have.
\*\*\*

[I]t's my . . . feeling that if proper history had been obtained, and if risk factors had been evaluated by a proper professional, the outcome of this might have been different.
\*\*\*

[T]hey should have gotten a psychiatrist, a child psychiatrist or somebody, to see this person. Again, would it have changed the outcome? I don't know, but I wouldn't be sitting here then.

(*Id*. at 122-23, 125, 153).[3]

Additionally, counsel obtained a report from the New York State Commission of Correction concerning Javon's death. The report was based in part on the findings of the Commission's Medical Review Board, which had investigated the circumstances of Javon's death. The report states that, although Javon had expressed an interest in obtaining medication for depression, he "was never referred to the mental health nurse practitioner or the psychiatrist for medication evaluation," which was unfortunate since "the implications of negative outcomes for incarcerated minors are significant for those with symptoms of depression and anxiety." The report further indicates that following the July 26th examination,

---

[3]Stiebel also appears to view proximate causation in terms of temporal proximity, by focusing on the relatively short period between the alleged errors committed by Defendant in July 2004 and Javon's death the following month. (*Id*. at 141-42).

[t]here was no further mental health follow-up, although [it had been] agreed upon that [Javon] would be seen following his court appearance. No plan of care was developed following the 7/26/04 encounter. Overall, the evolution of treatment afforded [Javon] was inadequate. . . . There was no treatment plan, no follow-up after release from constant supervision, no monitoring, no medication.

(Commission of Correction Report at 4). Additionally, the report indicates that although JG's job duty was to "evaluate high risk inmates being maintained on constant watch," that responsibility was "not commensurate with [his] state of training, with the level of his experience with depressed adolescents, or with the level of supervision he received from properly credentialed mental health professionals." (*Id.* at 6).

On July 27, 2007, Defendant filed the subject motion for summary judgment, arguing that Plaintiff cannot establish either that Defendant breached the standard of care owed to Javon, or that any such breach proximately caused Javon's death. As to both issues, Defendant contends that Stiebel's opinion is deficient. First, Defendant contends that Stiebel has identified only one instance in which it departed from the standard of care, namely, that Defendant failed to obtain Javon's Hillside Records. Defendant argues, however, that it is unclear whether the most significant record, a report dated August 1, 2004, which may have been prepared in connection with Javon's sentencing, was available to Defendant at the relevant time. Defendant maintains, in any event, that the decision whether to obtain the Hillside Records was a "clinical judgment." Furthermore, Defendant contends that Stiebel has not indicated that the alleged deviation from the standard of care proximately caused Javon's death. In support of its application, Defendant has submitted, among other things, an affidavit from its medical expert, Jeffrey DeLisle, M.D. ("DeLisle"), who states, with a reasonable degree of medical certainty, that Defendant did not deviate

7

from the standard of care, and that any breach was not the proximate cause of Javon's death. Plaintiff, on the other hand, maintains that there are triable issues of fact, based upon Dr. Stiebel's affidavit and Commission of Correction Report.

## DISCUSSION

### Summary Judgment Standard

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. See, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. Anderson, 477 U.S. at 249; see also, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as

8

provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under New York State law, "[t]he requisite elements of proof in a medical malpractice action are (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage." *Bloom v. City of New York*, 202 A.D.2d 465, 465, 609 N.Y.S.2d 45, 45 (2d Dept. 1994) (citation and internal quotation marks omitted).

> Where a defendant has demonstrated entitlement to summary judgment, a plaintiff must adequately rebut that showing by establishing a departure from accepted medical practice, as well as a nexus between the alleged malpractice and plaintiff's injury. Moreover, general allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant physician's summary judgment motion.

*Grzelecki v. Sipperly*, 2 A.D.3d 939, 941, 768 N.Y.S.2d 47, 49 (3d Dept. 2003) (citations and internal quotation marks omitted). "Under certain circumstances, a tortfeasor may be held liable for the suicide of a person that is the result of the tortfeasor's negligent conduct,

9

provided the suicide is a foreseeable consequence of the tortfeasor's acts. *Watkins v. Labiak*, 282 A.D.2d 601, 602, 723 N.Y.S.2d 227, 228 (2d Dept. 2001) (citations omitted).

To qualify as a proximate cause of the suicide, the defendant's actions need only have "substantially contributed" to the death. *Koren v. Weihs*, 201 A.D.2d 268, 269, 607 N.Y.S.2d 257, 259 (1st Dept. 1994) (citations omitted). Put another way, to create a triable issue of fact as to proximate causation, the plaintiff must produce "sufficient evidence from which reasonable persons might conclude that it was more probable than not that [the] decedent's injury was caused by the defendant." *Rubin v. Aaron*, 191 A.D.2d 547, 548, 594 N.Y.S.2d 797, 799 (2d Dept. 1993) (citations and internal quotations omitted). On the other hand, "if it is just as likely that the accident might have occurred from causes other than a defendant's negligence, the inference that the defendant's negligence was a proximate cause of the accident may not be drawn." *Johnson v. State*, 27 A.D.3d 1061, 1062, 811 N.Y.S.2d 850, 851 (4th Dept. 2006) (citations and internal quotation marks omitted).

Applying the foregoing legal principles, the Court finds that Plaintiff has not come forward with sufficient evidence of proximate causation to survive summary judgment. In short, Stiebel does not indicate in his deposition testimony or in his affidavit, to a reasonable degree of medical certainty or otherwise, that it was more probable than not that Javon's death (or any alleged pain and suffering prior to his death) was caused by Defendant's alleged deviations from the standard of care. At best, Stiebel indicates that Javon might not have died if Defendant had treated him better, which is insufficient. *See, Nieves v. City of New York*, 91 A.D.2d 938, 939, 458 N.Y.S.2d 548, 548-49 (1st Dept. 1983) (Holding that medical expert's speculative testimony that "the suicide 'could have been' a result of

10

decedent's discharge, and that it was 'possible' that he had received treatment he would not have taken his own life," was insufficient to establish proximate cause).   The Commission of Correction Report similarly fails to provide proof of proximate causation. Consequently, Defendant is entitled to summary judgment.

## CONCLUSION

Defendant's application for summary judgment [#48] is granted, and this action is dismissed.

SO ORDERED.

Dated:      Rochester, New York
            January  8   , 2008

                              ENTER:

                              _Charles J. Siragusa_
                              CHARLES J. SIRAGUSA
                              United States District Judge

11